Case No. 16-1058 et al. Veritas Health Services, Inc. Viewing business as Chino Valley Medical Center Petitioner v. National Labor Relations Board Mr. Cohen for Petitioner Veritas Health Services, Inc. Mr. Taubman for Petitioner Jose Lopez, Jr. Ms. Sheehy for Respondent and Ms. Chandran for the Intervenor Good morning. Good morning, Your Honors. May it please the Court, Jane Niecom, the law firm DLA Piper, representing Petitioner Veritas Health Services, Inc. doing business as Chino Valley Medical Center. By prejudging this case before any testimony was taken or evidence presented, A. L. J. McCarrick made three fundamental errors that undermined the Board's decision and as a result interfere with employees' Section 7 rights to select their bargaining representative. One, A. L. J. McCarrick made a fundamental error by not conducting the highly fact-specific analysis required under Master Slack to determine if the ULPs during an election campaign that occurred three years earlier actually tainted the loss of majority support that led to the decertification petition in this case. Two, A. L. J. McCarrick made a fundamental error by refusing to allow Chino to obtain materials and information showing that UNAC, the union here, its three-month delay in starting bargaining was inexcusable. Even in part, even a week, an issue critical to determining when the certification bar ended. Three, A. L. J. McCarrick made a fundamental error by applying an erroneous legal standard requiring that in order for Chino to introduce the decertification petition in this case, it had to have, at the time the petition was received, authenticated every one of those signatures. A standard that is erroneous and Chino could not meet. Those errors require reversal and remand. That isn't the standard that the A. L. J. applied. The A. L. J. in Elda's opinion articulates the Levitt's test and there was a lot of back and forth and a lot of unarticulable statement. I think everyone was sort of stumbling into that issue of what needed to be shown. I think we can agree that what needs to be shown is first that the evidence gave the employer an objectively reasonable basis to think that the union had lost the confidence of a majority. And then if that's challenged under Levitt's, the employer has to show, has to, you know, substantiate that those are accurate signatures, that they were at the time that they said, that they were people who were then employed. You know, just verify that it really does show that a majority of the employees as of that time. So if that's what Levitt's requires and if there's ambiguity in the oral transcript, what do we do with that? Well, first, Your Honor, I agree with you. That is what Levitt's requires. I disagree, however, if there's any ambiguity in this transcript. From the very first opening minutes of this hearing, even before the hearing started, A. L. J. McCarrick said in his words the deserpitation petition is, quote, irrelevant. He wanted, he didn't want to see that deserpitation petition. Before a single witness was sworn, any evidence presented, he said, declare, matter of law, irrelevant. And then when Chino attempted to introduce that petition, his quoting A. L. J. McCarrick, if somebody from the employer didn't authenticate all of those signatures at the time they received it, as far as I'm concerned, the objective considerations were invalid. So he's looking at the Levitt standard, but he's saying you have to authenticate them at the time. And he goes on, you can't come in now and say, oh, by the way, we'll show you who they were. He's saying, Judge Plott, exactly opposite of what you just asked me. You can't come in now and say, oh, by the way, we'll show you who they are. No, you had to do it then to have a good faith doubt at that point in time. That's a standard that's erroneous, and it's a standard we could not meet, Chino could not meet. It didn't have a witness who could show at the time those statements were authenticated. Well, did you have a witness who could show as of the time, as of the time, that those signatures were valid? You mean as of the time of the hearing? No, as it could show at the hearing that they were valid when collected. Well, there was a reasonably, objectively reasonable basis to believe at the time. I think you mean the notice of decertification came from employer to union. Is that right? I'm actually going a little further than that. Assuming it was objectively reasonable, then the union says, no, it's not. We need to know a lot more. We need to know who actually was employed at the time. Can we read those signatures? Who were those employees? Did the signatures match the employees' actual signatures? We need to know that. And what my question is, is was Chino prepared to show the thing that it does actually have to show when a petition is challenged under Levitz? Was it prepared to show that given the employees who were employed at the time the signatures were collected, that we can discern who these are, that they were indeed a majority? Was there a witness available to do that? There was a witness. There were two witnesses. One, the general counsel, where Chino was sitting at counsel's table, who was prepared to testify to verify at the time of hearing they were authentic, not to testify as A.L.J. McCarrick was requiring that at the time they were received we verified authenticity. Under ambassador services, the board has said a withdrawal of recognition is not unlawful where the employer does not verify the authenticity of the signatures on a disaffection petition before withdrawing recognition. That that's what A.L.J. McCarrick was requiring Chino do here, which we could not do. The other person... Counsel, to help you understand, I actually read his comment differently than you did. I'm looking at J.A. 404 and 405. He said, I've considered this matter and basically proof of objective considers to justify withdrawal of recognition is a burden of the employer. And then here's the key sentence. And it is a burden they have to establish at the time they receive the documents. I'm sorry, the next sentence is the key sentence. So if somebody can't, if somebody from the employer can't authenticate all of these documents or didn't authenticate all of these signatures at the time they received it, as far as I'm concerned, the objective considerations are invalid. So you see, as I read that, the A.L.J. is giving you two options, right? And only one of them is the requirement to authenticate at the time that they received it. The other is a general, you can authenticate all of these documents, and you didn't do that. I think, Your Honor, you have to read that sentence in the context of the rest of the colloquy here. And it's a burden they have to establish at the time they received the documents, the sentence before, the sentence after. You can't come in now and say, oh, by the way, we'll show you who they were, which would be the second. He says you can't do that. You had to do it then to have a good faith basis out of the time. Right. I think, I mean, it is, I can see that it is somewhat unlawful. But I think what he's saying is that the point of validity is then. So, and I take it also, though, that this is kind of for you in the background because you object to the A.L.J. saying this is not relevant. Now, I think that what's, I mean, as I understand it, the question is, is if this is during the certification year, then why would it be relevant? If there's a bar to any kind of challenge during the certification year, then I think he's operating on that premise. So it's not that he doesn't want to hear relevant evidence. This is a legal matter. Given where we are, it's not relevant. One, a few things, Your Honor. First, the reason A.L.J. McCowrick says, quote, it's irrelevant, is because he's relying on the reported paint of the ULPs from 2010. It is not because of the certification year. That's his unequivocal statement at the very beginning of the evidence. And then on the certification year itself, there are two important points here. One is this decertification petition was circulated with signatures collected and presented to the employer in the final days of the certification bar per the general counsel and UNAC. But it's our position, Your Honor, that the certification bar actually should have started earlier. And that's the, it's one of the other three critical areas by A.L.J. McCowrick. We, Chino, should have had the opportunity to show at the hearing that the certification bar started earlier. It didn't start on June 13, 2012. But can I just get back? I'm sorry. I wanted to get you to make your point. But just another one. What, you agree that someone turns in a petition to the employer that has signatures on it. Do you agree that that's, without even looking, that suffices for the employer to announce I'm withdrawing recognition of the union? Or do they have to have an objectively reasonable basis at that moment in time to say. That's exactly what Levitz commands, Your Honor. Which might be the latter. So it's the latter of your. You have to have an objectively reasonable basis at that time. You could check the signatures at that time if you wanted, or you may have some other basis for being objectively reasonable at that moment in time. Right. But you did not have to do what A.L.J. McCowrick required, which was authenticate each and every signature at the time. Sure. And have a witness standing next to me at the hearing who was prepared to testify all those signatures. So what did you have to show objective reasonableness at the time the decision to withdraw recognition was made? I think, unfortunately, the record is, that's absent from the record because A.L.J. McCowrick's decisions here. The decertification petition, which would be. Where did he say you can't show, because earlier on that same page it says, you've got to show they were pages 7 through 11. You've got to show they were bargaining unit members, affixed their signatures. At the time they affixed their signatures, they were bargaining unit members, which raises a collateral question. If respondent didn't check that, is that objective proof? Probably would still be, in my view. So there probably would still be objective proof, in my view, if he didn't check at the time. But I just didn't know what you were proffering as the objective. What you did that was objectively reasonable back then. We were proffering the decertification petition itself. And under Levitz, which was a decertification petition case, the court presumes in that case that the decertification petition is objective proof. So then it sounds like it's my first scenario, which is I don't have to do anything. Someone hands me a petition. I don't even have to look and count to see if it's the same number. All I have to do is say, here's a petition. And I get to say, good, I'm withdrawing recognition without even looking at it as long as when that hearing comes, I'll be able at that point to prove it, which is a very different test. And that means you don't have to have any objective basis at the time you withdraw recognition. It would be good to do it. It would be less risky, but you don't have to do it as long as you can prove it later. And I thought you said that's not the test. I'm not saying, Your Honor, that there is absolutely nothing that has to happen at the time. It has to be objectively reasonable at the time, correct. But that may be, Your Honor. How does that get proved? It may be simply a counting of the numbers. Okay. You know how many, you're the employer, you know how many members in the bargaining unit. So did you have, and so what were you wanting to offer to prove the employer did to show objective reasonableness at that moment? It would have been the, what we needed was the decertification petition itself. It can't be the, oh, lucky for us, they're valid at the hearing. Okay, you said that's not right. Right. So you would have had to show, one way would be to show, actually we sat down and checked the signatures right then. And that would have been allowed, but you didn't want to do, and you didn't have to do that. And so what else were you going to show? All that was needed was the introduction at that time of a decertification petition, which was received, there's no question it was received. It was communicated to the union that it was received. That was the attempt at showing. That was the attempt at showing? It was just to submit the decertification petition. It was received. Well, I mean, at this point, Your Honors, we don't have any record evidence of what happened because of ALJ McHarrick's decision. No, we have a discussion. So I'm just trying to understand your position about what the employer was prepared to submit. Because you said the general counsel was there, and I think we interrupted you. You didn't say, you said there were two witnesses. The general counsel was there, and who else was there? The general counsel was there who was the one who had received the petition. Again, at this point, we're now outside the record, Your Honors, and I caution you. Usually there's proper records. So to that point, Judge Millett, we were told unequivocally as a matter of law by ALJ McHarrick the petition was irrelevant. He then said, you can't come in and introduce it now. And who was your second person? Should we have tried again? Who was your second person? I think at this point we can't have second guest trial counsels being rejected twice. Who was your second person? Just so I don't step on that. We had the individual who collected the signatures. He's the attempted intervener. Although I think he had exited. He exited the hearing. At this point, he had exited, Your Honor. He wasn't present. But he attempted to intervene in this case. It was his Section 7 rights that were there. Was he the person who personally collected all the signatures? I can't speak to that. And the general counsel, so the general counsel, though, would have said this is, in fact, something I received. Presumably, Your Honor. But wouldn't have personal knowledge of the affixing of the signatures, right? In terms of them being actually signed to the piece of paper? I would assume so, but I can't say it was not on the record. On the certification year and the challenge to getting up the certification year, as I read the decision, there was no delay in the ALJ's view. And if that's the case, then you don't even get into the question of whether or not it was unreasonable. Well, I think, you know, there's a recognition that there's a delay from the time this court issued the bargaining order in, I believe it's March, until the first bargaining session. There's unquestionable. It was three months. There's no question. I guess the question is, is that delay is a legal matter. What the ALJ says is some time can reasonably be allowed before the certification year begins for the union to reestablish contacts with union employees to facilitate bargaining on their behalf. Some time can reasonably be allowed. And so I think the question is, is that even delay if the kinds of things that, you know, we're going to check back and forth with one another, we're going to say, you know, are you available on these dates and we're going to be back as a responsible union, and should be back in touch with members and formulate bargaining priorities according to the members' wishes. That's time. And as I take the ALJ's finding, that's not delay. I respectfully disagree, Your Honor. It is delay. This court, not this court, the board has found in the employer delay context, a month of not setting and scheduling bargaining is delay. Forty days is delay. And in Dominguez Valley, the board formed by the Ninth Circuit conducted a proper analysis of a three-month delay and allowed the employer in that case to introduce evidence over why there was a delay. The board ruled, well, a lot of that delay was actually attributable to the employer, so it wasn't going to say the three-month delay was enough to change the certification year. And in that case, the withdrawal came three months before the end of the certification period. Here we're talking a week. If there was evidence that could have been collected under this court's decision in Ozark Automotive, the employer was entitled to that information. Here, Judge McCarrick says he prejudges the issue. He says it's irrelevant. What reason do you have to believe that, I mean, I'm thinking delay, so if I'm waiting for the red line and it's eight minutes and it's usually eight minutes and it's coming in eight minutes, I don't think that the train's been delayed. If the train, there's some elapse of time. But when they said, oh, hell, because of, you know, malfunction at, you know, Bethesda, then I think there's delay. So. I'm smiling, Your Honor, because the Metro just gets me the delay, but I wasn't smiling at the question or laughing at it. So if there isn't delay, then what is the threshold? In every single case, there's going to be discovery into one another's thinking when nobody has a reason to think this is out of line? Well, there was. I mean, there's no question, Your Honor, there's a three-month gap between the bargaining order. Right. And the question is, whose burden is it to say, you know, there's delay? I think here the employer had some burden to show there is an inexcusable delay, the test under Dominguez Valley. And this inexcusable delay, even procrastination counts. But we were precluded by the LGA. It's an unreasonable delay if the employer agrees to it. Can it be an unreasonable delay if the employer agreed to it? If we don't know the reason why. No, if you do know the reason why and you say that's fine. If we were to know the reason why, if, I think that's a different scenario. That's not the scenario we have here. First, then, if you go to JA 283 where you have the e-mail from the union. Hi, Mary, thanks for the information. We'll be reviewing it and proceeding with proper preparations for bargaining. If there's a reason to meet tomorrow, give me a call. She goes, that's fine. Please let me know what dates you have. So that's fine to take the time to review the information, proceed with preparations for bargaining. And then within a month, they've got less than a month, they've got the union proposes dates. So she said it's fine, take the time, look it over, prepare for bargaining. And then 28 days later. Let me explain, Your Honor, that free week differential. And that's what Dominguez Valley now analyzes is the month delay to prepare. What explains the two-month delay? They send a letter to the next page of the JA. Here's the dates we propose. And then we turn the page and there's the employer saying, I'm confirming June. But you asked me, Your Honor, if we understood the reason for the delay, is it still a delay? In that case, maybe there was an understanding for the three-week differential between the time the union proposed the dates, but there is no explanation for the statement in March offering the early June dates. Perhaps Barbara Lewis was taking vacation. That was the end of April, April 20th, for proposing June 13th. And what I'm wondering is, so they said that's fine, take time as you need, and then there's no, I don't see any communication where she comes back and says, Why are we waiting until June? She comes back and says, June 13th, let's lock it in. And that's exactly what ALJ McCarrick should have permitted Chino to obtain evidence on. Ozark Automotive is in the middle. What evidence do you need? You can have Ms. Schottmiller works for you. You don't need them for that. And she said, That's fine, take your time. And then we get the dates, and then she comes back and says, Here's June. I pick June. Those are two separate instances. One is the first three weeks before we get the dates. The second is the two months. And that's exactly how do we know? And Ozark Automotive, where this court relies on statements by now justices Alito and former Justice Scalia and says, We can presume and assume what the evidence or the information sought would have shown and that would have supported the employer when an ALJ refuses to enforce a subpoena going to a critical issue. Here, if I was able to, if we were able to collect evidence or obtain evidence, even a one-week delay was partly from procrastination from Lewis or someone else at UNAC. Are you any case of unreasonable delay where the employer had said, That's fine, and never voiced a word of objection? And you see things proceeding in organized steps here within reasonable time frames? I'm not aware of a case, Your Honor, but again, this is unique. We're talking about a withdrawal that came, if anything, a week early or signatures were collected a week early. Withdrawal was rescinded and came after the certification error, even under UNAC and the general counsel's position. So over a three-month period, if there was a one-week delay that's inexcusable But it makes sense that everyone, if they know when bargaining began and if that's the presumptive rule, that everyone's operating to a deadline. I mean, they think, Okay, we have this certification year. And your brief says that the union acted unlawfully. I don't understand that at all. Why would it be unlawful? Well, if we look at the board's view of employer delay, when it says an employer is delaying for a month, 40 days, and that delay is unlawful? In similar situations where an employer may be, I think the board has said, if I remember correctly, schedules don't matter, bargaining matters when they're talking about employers. But now when the script is flipped and we're talking about a union delay, it seems like they can take as much time as they want. Yes, there is, and Dominguez Valley recognizes there must be some time in order for preparation, particularly when there's been some delay between this initial election and bargaining year. We should let you sit down, but I have one other question. Sure. Why was the letter saying you no longer represent, we have reason to believe you no longer represent, it was sent and then it was sent in error and it was withdrawn and then it was sent again three days later? What was that all about?  Oh, it is in the records. Well, no, the letter is, Your Honor, but the testimony that goes to why it was withdrawn is not on the record. The letter itself, I believe, I think it simply says it was withdrawn and it's reissued a few days later. Is it safe to presume that it was a question of when the certification year ends, the same thing we've been discussing for the last 15 minutes? I think that's safe to presume that testimony doesn't exist in our records. I can't speak to it, though. The ALJ made a finding that the union validly accepted the outstanding terms and I didn't see you challenge that before the Board. How does that bear on this? I do believe we challenged that in one, the post-hearing objections, and I believe that was challenged before the Board, Your Honor,  but one, even under that reasoning, ALJ recognized there wasn't an agreement on the length of the CBA, so it wasn't actually a final agreement. Second, it's, I think, clear when you look at the union's conduct, when they, three weeks earlier, out of hand reject the employer's offers, on June 9th, Chino receives that decertification petition and all of a sudden the union has an about face on things they rejected and said were absolutely unacceptable. I think that, in some ways, is a bad face shown by the union, knowing that they've now lost majority support. The third piece, Your Honor, is they didn't know that. They were knowing they were coming up against a deadline. I don't know that that's right. I mean, I don't think there's any record of testimony on that, Your Honor, but the third piece is, as an employer, we are required to withdraw recognition and stop bargaining with a minority union. Not during the certification year, Your Honor. You can't. Well, there's, I think, two things there, Your Honor. One, we challenge that when a certification year truly should have began, again, even a week delay, we should have been able to collect evidence, and under OZARC that's reversible unequivocally. The second, Your Honor, is a withdrawal at this point, one that was a petition presented to us two days early, I think, is de minimis under LTD. This case is much more similar to LTD than it is to Chelsea Industries where the petition comes five months early, the parties essentially stop the withdrawal at that point. We're looking much more in the LTD camp than we are in the Chelsea Industries camp. Thank you, Your Honors. I'd like to stop there. Thank you. May it please the Court. I'm Glenn Taubman on behalf of Petitioner Jose Lopez. As you have heard, this entire case revolves around one thing, the timing and validity of Mr. Lopez's decertification petition that he collected, yet when Mr. Lopez filed a straightforward motion to intervene to ensure that his petition and his Section 7 rights, and I would add he's the only person in this room who has Section 7 rights, he filed a motion to intervene, and he tried to protect his rights and protect his petition, and two ALJs at the Board refused to allow him to intervene and completely silenced him from defending his rights. If we were to hold that the petition was procured during the certification year, If you were to hold that the petition was procured during the certification year, would there be any reason for your intervention? Yes, absolutely, positively, and I'll tell you why. Because Mr. Lopez could have offered evidence and testimony that would have been relevant to that issue and all other, What issue? the certification year issue, because Mr. Lopez had no way of knowing when this certification year began or ended. Is it going to be true in any given case? I don't understand what that has to do. The intervention here was that he could come in and help verify the signature on the petition, but if that issue isn't an issue, what does he have to say about the timing of the certification year, different from the employer? Well, if you look at what the ALJ said about the LTD ceramics issue, which is on page JA-22, the ALJ says the respondent chose not to offer the petition, and it is safe to say that the signatures were collected prior to June 9th when the respondent received the petition. Thus, this case is distinguishable from LTD ceramics. Mr. Lopez could have testified that he had no idea when the certification year was, he was doing his best as an employee to try to protect his rights and the rights of his fellow employees, and that this case really was like LTD ceramics. You say he didn't have any way of knowing. Are you stating as a matter of fact that Mr. Lopez did not know the certification year? I don't believe Mr. Lopez knew the certification year. And, in fact, the fact that UNAC, the NLRB, and Chino can't agree on what the certification year is, how is an employee who's a nurse, not a labor lawyer, how is he supposed to know? He did his best to collect signatures, to exercise his Section 7 rights. If the certification year is the outside one, June 13th or whatever, there's no question that he collected the signatures. Is there any question he collected the signatures before the outer one certification year? There's no question. If, in fact, we're going to have this hard and fast date of June 13th, yes. Right, so then this issue doesn't matter. Whether he knew or not doesn't change the certification year. Well, it matters in the sense that this whole proceeding, why we're here, is the protection of employee's Section 7 rights. Well, the one question I have is why isn't Section 9, the petition under 9C, fully protective of Mr. Lopez's rights here? It wouldn't be, Your Honor. In part, that would be because of the Board's blocking charge rules. Had Mr. Lopez waited until June 14th and filed a decertification petition, I can guarantee you that the Board would have said, we can't process your petition and we won't process your petition because we have these things called blocking charge rules, which in the Skomas case that this Court issued a few months back, Judge Henderson wrote about that. These are Board rules that prevent employees from exercising their Section 9 rights. So you're talking about the rule that when there's an agreement in place. No, no. I'm talking about when a union files unfair labor practice charges that aren't fully remedied, then no election can go forward. So just like the Board is saying this withdrawal petition was invalid, had he filed a decertification petition with the Board, they would have also said. But they were still unremedied on June 9th. Excuse me, Your Honor? They were still unremedied on June 9th, so the blocking charge thing would have gone through this whole time. I don't understand why that makes a difference. Well, I'm trying to answer Judge Pillard's question, that for the Board to hold this out as a remedy. Oh, you could have filed a petition under Section 9. It's an illusory remedy. Is it illusory for a different? I mean, it's the same issue that the intervention addresses. And so the question is, is there something worse about being left to Section 9 rights? And I guess there are three different blocks here, right? There's the block of the unfair labor practices. There's a block of the certification year. And there's a block once there's a collective bargaining agreement in place. And all of those, I mean, we hold national elections periodically, even though during the period of someone's tenure in office, people may lose confidence in that individual. So, too, with a union, there's a periodicity, so that action happens and then there's an evaluation. So I take you to not be a fan of those rules, but those are pretty well established, right? Well, they're fairly well established, but I'm just trying to make the point in answer to your audience question that when this is held out as, well, Mr. Lopez's rights would be protected if he had only filed a petition under Section 9. I'm telling you that they wouldn't. And, again, the whole reason that we are here, I believe, is to protect employees' Section 7 rights. And Mr. Lopez's were not protected. What about – sorry, just one quick question to try to understand. I understand your argument and your argument that employers don't represent employees for purposes of asserting their rights in this regard. What is your – would your position be that every employee that signed that petition could also intervene? I think that's pushing it a little too far. How? Every one of those employees has the exact same right as Mr. Lopez. I'm just trying to understand the limiting principle. I can imagine, you know, and then all the employees on the pro-union side want to intervene. So what limiting principle do you recommend for these decisions? It can't be just the one who did the collection. Well, okay, let me try to answer your question this way. The NLRB has no discernible standards for who can intervene. I think that's very clear. It's very clear from the cases we cited. And, if I may, Your Honor, you were on the panel in the other Lopez, Ramiro Lopez and Latino Express, and the same issue arose there. It's clear that the NLRB looks at these motions to intervene in a very haphazard way. But, you know, I'm using the pen, and I'm saying, what do you recommend? I get that it's hard to discern. I hear that argument loud and clear. I'm just trying to figure out, if you're asking us as a court to say they didn't hew to the law here, what is the standard that's not going to have all the employees in there? What's the legal rule you want, not the one the board has? Certainly, if the decertification petitioner or the proponent of the withdrawal petition attempts to intervene to protect that petition that he collected, he absolutely, he or she absolutely, should be entitled to intervene. Again, what would the opinion say to distinguish why every employee? Imagine you've got some great big companies out there. You have thousands of employees, and every one of them, how would we say, no, you don't get to, but the five people or the 20 people that helped to collect this get to? I think the answer that I would give you is, now we're at the adequate representation prong of Federal Rule of Civil Procedure 24, assuming we're applying that by analogy. In other words, if I represent Mr. Lopez and I file a motion to intervene, and now I'm representing Mr. Lopez, and 27 other employees separately try to intervene, at that point, the ALJ could say, well, you are represented by Mr. Lopez and his attorney, so now we have a duplication here, and there is already adequate representation. But as far as Mr. Lopez is concerned, there's never been adequate representation in this case. But I think that's the answer to Your Honor's question. At a certain point, the ALJ is entitled to say, there's already adequate representation, so we don't need 900 signature signers to come in, but as long as we have this one person who did file a motion to intervene, who has an attorney, and in answer, I think, to one of Judge Pollard's questions, Mr. Lopez was physically at the hearing at his own time and expense. He showed up at the hearing with his lawyer. He sat through quite a bit of the hearing. At a certain point, when it was obvious that he couldn't intervene and he wasn't going to be called, he went back to work his shift. Now, there was discussion colloquially at the end. He could have been called back the next day. It was already late in the day. They could have suspended the hearing and said, okay, Mr. Lopez, come back tomorrow. The ALJ even could have reconsidered his decision to exclude Mr. Lopez, and there's testimony in the record that everyone recognizes, or it's a colloquy at the end. Everyone recognizes that Mr. Lopez had a lot of valid and valuable information to give. Let me ask one little question about you mentioned in the briefing, I think it was page 3 of your brief, that you filed exceptions on Mr. Lopez's behalf. I don't think we have those in the appendix. Are those available to us? Exceptions to the board. Can you tell us on what grounds you accepted that are relevant here? I think the grounds that I accepted are basically the same grounds as we raised in the motions to intervene, frankly. I think I raised the same argument, that the judge erred as a matter of law by not allowing us to intervene. If they're not in the record, I mean, I can find them and supply them if you're interested, but I think they're functionally the same arguments that were made in support of the motion to intervene. Great. Thank you very much. Thank you, Your Honors. Good morning. Good morning. Barbara Shaheed for the National Labor Relations Board. I'm just going to answer very quickly. The exceptions you write are not in the record that were filed by Mr. Lopez, and it was limited strictly to the issue of intervention. They did file exceptions before the board, though, and I'm happy to provide that to the board and transmit that. It's a short document. I saw it this morning. I'm going to start with what was the very first question I'd like to offer my answer. Your Honor asked, laying out that we had this sort of inartful colloquy towards the end of the hearing, what do we do with this? And what do we do when there are inartful statements between sort of everybody I think involved, both the general counsel, the union attorney, the attorney for the hospital, and the ALJ? And I think what we do with that is we hold a prudent counsel to preserve a record for repeal. There is not a definitive ruling on this record. The ALJ did not say, you cannot introduce respondent exhibit number eight. You cannot introduce that petition. What we have is, again, many inartful statements, but we had also at the hearing at the time was the HR representative, Schott Miller I think is the name, who by all accounts was the one who received the document, and we read the transcript with the ALJ the same way that Your Honor did, Judge Griffith, that there were two alternatives. You had to authenticate the document. Because let's remember how this conversation that we're all looking at, the 10 to 12 pages toward the end, it came about because the hospital attorney said, we would like to enter this document into evidence. I'd like a stipulation. The general counsel asked to its authenticity. The general counsel and the union were both uncomfortable with stipulating to the document for various reasons. So then followed the conversation about how does this document come in, and there were some, again, inartful legal statements. But at the end of the day, the hospital representative was not prevented from entering that document into evidence. In fact, the very last thing the judge says before ultimately the hospital, I guess, decides to rest its case, the ALJ says, and this is on Joint Exhibit 405, you have to have, did you have proof that the union had lost the majority? Now maybe you can establish that. Maybe you did that. I don't know. I'll give you an opportunity to show it. So that's where I'm going with that with respect to RX-8, which is the petition. That's something that respondent's witnesses will have to establish. So at that point, the door is wide open for the hospital attorney to formally, on the record, introduce, either through Schottmiller, or I understand Mr. Lopez at this point had left, but there's no indication, for instance, this ALJ wasn't willing, there's no indication that the hearing couldn't be put over for another day or until Mr. Lopez was available. So certainly the opportunity was there, and the door was left wide open, and what this counsel opted to do instead was rest. So we do not have a clear record on appeal of what the ALJ would have formally done if presented with a petition. Would the inaugural statements have carried the day, or would briefing on the issue resulted in the admission of the document? So I think I wanted to start with the very first question. That's really helpful. And then, so I'm going to sort of move through the three different, so one of the other first things I should have said is, and I think your honors all recognize this, there are three independent separate grounds for upholding the board's finding that the employer unlawfully withdrew. All of them stand on their own. They're not interdependent. So this one about the lack of support, showing actual loss of majority support, is one example. So I'll move into, I'll sort of track that. Sorry, go ahead. On the, I think it's the second ground decision, the certification date, I'm trying to figure out whether that really satisfies all of Mr. Lopez's arguments. Does it foreclose any claim he might have as to prejudice? Is it your position that nothing, no testimony that he might have presented would have made a difference? With respect to the timing? I think what the board does when they look at, when they're trying to determine whether or not another party should be granted intervener status. So I think what they do do actually is what respectfully counsel for Mr. Lopez said is what he's recommending is we should look at adequacy of representation. And I think just by another name, that's what the board is doing. They look at, under the rules, is there, are your interests protected? But I see an even narrower question. Sure. If the board was right about the certification year, then there's no prejudice. One way or the other, Lopez would come in and testify until the cows come home. But it's just, as a legal matter, it's just foreclosed. Absolutely. He is absolutely one day short of a year, you know, with the exception like the LTD ceramics. But sort of speaking globally in terms of withdrawal, the certification year holds for 365 days. Yes. And if the withdrawal occurred before that, the petition, Your Honor is absolutely correct, does not matter. The petition does not matter if the withdrawal occurred and the signatures were all, so this is what puts it on a different footing than LTD ceramics. In LTD ceramics, several of the signatures in that case were obtained at the tail end of the certification period, so during the barred time. But then the majority of them actually occurred outside that window. Here we know every single one of them had to have been obtained before the employer withdrew recognition. So that puts it on a very different footing. And it's not, I mean, de minimis doesn't make sense in this context. De minimis in the context is, de minimis, how many of those signatures really at the end of the day only came during the small window of time, during the window of time where you shouldn't have gathered them? And are they small enough so that we're going to let the petition go forward? That is not de minimis here when every single one of them, all 71 of them were collected during the window of a barred period. So it's your position that even if it was a week later, if they presented this petition, it would be barred because the timing of the collection of the signatures matters for purposes of the bar? If it was shown, certainly, that the petition, and this gets to the authenticity of the documents, if it is shown that at the time the employer withdrew, no, sorry, to your question about the collection of the signatures, yes. If they were collected during the period during which you are not permitted to do that, then yes, the withdrawal based on that under the case law is, with the exception of LTD, so again you get into where some of them were collected during the barred period, some of them after, but if all of them are, there's not a case that suggests that that falls under the board's exception under the de minimis standard of we're going to permit this because it was at the tail end. So yes, currently there's no case to hold that even if all of them are collected, but just at the very end, that's okay. There's no case that says that, and the board certainly doesn't say that here. And it's not just a question of the employer being barred. It's the inquiry into member support is just kind of put on hold for that whole period? It's sort of a formal process under 9C, which your Honor talked about a little bit with counsel for Mr. Lopez, that yes, you do have to stop short. So there are rights protected under 9C, but those are curtailed during a very defined period of time. He could have gone around, and he can still do this now, and tell everybody how much he doesn't think the union's any good, I don't think the union's doing anything for me, I think negotiations are dragging on, they're terrible. What he has to stop short of, though, is actually formally engaging in a decertification petition and collecting signatures in that regard. He could have done it in 9C, he can't do that as an intervener. Is that what you're saying? Not during 9C, he cannot. Under the certification year. Under the certification year, that's correct. Could he have done it the day after? He could do it the day after, certainly. In this case, he says there would have been yet another bar because of the un-remedied labor practices. Due to the unique circumstances of this case, so the blocking charges were absolutely correct. So he could do it now that the Ninth Circuit has ruled on the un-remedied labor practices? Not if the board's decision, not if this decision is enforced, because the board imposed an affirmative bargaining order. How are employees supposed to know when they can do this? Is it posted somewhere? I can't for the life of me figure it out. I have trouble figuring out when they can do it. So how are they supposed to know when they can go for it? I appreciate that. But the decisions themselves and the notices, the notice posting would get posted. It's supposed to on employee bulletin boards. It's a standard remedy. Does it tell them when the certification year ends? I don't know. It's not going to use a term like that. But I believe the affirmative bargaining order, which is part of the order itself, the notice that would get posted, says six months from the date of enforcement. So you'd have to do a little research to say, okay, well, when did the notice say six months? I don't know if there's some other litigation out there, un-remedied practices. I don't know. Well, isn't this a concern to the board? No, because you could certainly ask. I say I don't know in the sense that I don't know what each individual union does to communicate with its members. So like it or not, Mr. Lopez is still part of this union because he's represented by them. I know he doesn't want to be. So I have no idea what their communication practices are. But it's possible this union communicated. And so he has to ask them when I can decertify you? I'm sorry? He has to ask the union when I can decertify you? No, what I'm saying is it's possible. So in a totally different life outside this record, I have experience with union communications. I've seen them. And those go to everybody, everybody in the bargaining unit, whether you want to be there or not. So I'm just saying I don't know what this particular, how this union communicates with its employees or whether it does in what regard. So they might be saying, you know, we're bargaining away. We're making some progress. We're going to get you something final by end of certification year. Is this such and such? Absolutely. Right. So it's possible. It wouldn't surprise me. I'm not even going to go that far. So I'm just going to say I don't believe this union. You said you have three independent grounds. Right. So the certification year. What's your strongest? I didn't think it was this. The certification year? Yeah. I thought your taint argument was the strongest one. Well, if that's the one you like, then I'll support that. No, I'm not saying I like it. I'm just surprised that it gives a response to the questioning. Sure, it is. You're right. So there were very few questions on the taint. I don't know that I, I don't know that the board. You like them all. I like them all. Because the board found, I don't think the board gives any indication that it felt like the evidence was stronger here. They led with the taint argument. That was the first one. How is Master Slack's direct causation requirement met with respect to these? So it's a causal link. It's not a direct causation. Right. And the board, what they did here is they looked at the particular violations. And I really, I don't know that we did it in the brief. The violations were six years old? I'm sorry? The violations were six years old? No, they happened in 2010. They happened during the organizing drive of 2010. Okay. So three years. Three years, right. Oh, sorry. And I urge the court, I don't know, we sent it in in the 28-J, the Ninth Circuit decision that just recently got enforced in September. This is not a matter of isolated, minimal things. There were over 18 violations, some as extraordinary as, or as extreme rather, as threatening to close the whole hospital if the union came in. They discharged the highest level organizing person there, who the chief medical officer. I get that. I get that. Had the ALJ said what the Ninth Circuit said, that might be different. What the ALJ said was these are of the sort that cause disaffection among employees. And that's all I could find on the causal link. Is that enough? So what I think the board does is they cite to, and this was probably just for purposes of efficiency, they cite to the original, I guess it's being called Veritas 3, I think it's the UOP case that happened in the Ninth Circuit. They cite to that case, they do the board decision, sorry, the board decision in that case with a pinpoint, I think, with a pinpoint site that articulates in that case the violations. So the ALJ then is shorthanding to say those types of violations are particularly egregious and result in employee disaffection because. For how long? Until they're on remedy because those are. Okay, so what does it mean that they're on remedy? Does that mean some of them are still going on or they just hadn't? So it means, for instance, the Hallmark 1, the true Hallmark violation was the discharge of the union person. That was over and done. So it hasn't been reviewed in the sense he still hasn't been reinstated. He hasn't been reinstated. Is the tardiness policy still in effect? To my knowledge, this isn't in the record, To my knowledge, none of the, it could be different now that the Ninth Circuit has spoken. Up until September 2017, none of those had been rescinded, retracted, nobody had been reinstated, none of that. So that's on the record. Is the collective bargaining agreement in place? I'm sorry? And the collective bargaining agreement has not been finalized and it's not in place? Well, it was final in the board's view except for the effective date. And it hasn't been made? No, because they've withdrawn recognition. So this started in 2010 with a refusal, I was involved in that case in 2010, with a refusal to recognize the union after the election. And then we had a series of 18-month-old labor practices. We've litigated that. And then right when they're on the cusp of a collective bargaining agreement, we have a withdrawal of recognition, and that's where we are. Let me ask you just a legal question about Master Slack. Is it the board's position that when the first three factors are established, as ALJ and the board held here, that it is irrelevant whether there's anything one way or the other on the fourth factor or only that there needn't be anything? Like if there were some evidence, I can't come up with a good hypothetical, but showing a lack of causation under the fourth, does the board have to go to the fourth factor? Or is it just like, no, we've got the first three? I think all four factors enter in. So the first three are objective, and that's why you have them looking at just generally what the violation was, the unremedied violations they're looking at. So they're like, okay, discharge. We know that that tends to live very long in people's memories. I'm going to lose my job if I do that. So the first three are objective. So it's all four still. The board will still look at all four. The fourth factor is the only one that is subjective in the sense that was there disaffection among this unit? And I know that there's. . . Let's say not so subjective as particular. Perhaps subjective because I said objective. But you're right, specific to this case as opposed to. . . And what would be the evidence that would show lack of causation in under four? I'm just trying to think of what. . . I mean, we really have to be sensitive to the procedural rights of the employer and of the disaffected employees. And so I'm just really trying to get at, well, what opportunities. . . Sure, I suppose. . . Might they have missed to put in what kind of evidence? So my answer is going to stem from I'm thinking of the opposite of what was introduced. So what we had here, which the board determined was sufficient under this fourth prong, was the union official testifying not only to the slow walking of the contract negotiations, but she also said as a union organizer in the facility that she felt like nobody trusted her anymore, that she was isolated, that nobody trusted the union, nobody would speak to her anymore. So that was, for the board's purposes, sufficient to show disaffection under the fourth prong. So to answer your question, I guess I would think perhaps the opposite of that. So if you could call witnesses who said, we don't like. . . I'm trying to think what they would be saying. We don't like the union and we don't want the union because. . . I don't know, they're just. . . Well, they say they have that here where they say nothing's happening, which is a little tough to know how to credit that because, yeah, nothing is happening because everything's been tied up in litigation. Right, and so that's one point we make in the brief is that, sure, you can be critical of the pace of negotiations, but how do you untangle the pace of negotiations is directly reflective of they couldn't get to the table in 2012 because of all of the ongoing litigation. So I think that's why it's a relatively. . . I think that's why the board here said, okay, not only do we have that and it's difficult to untangle, but what does it mean when people are frustrated with the pace of negotiations? Is that the union's failure as a negotiator or is that the failure of this to be moving forward because of continued unfair labor practices and the inability of the union to go forward? So instead of just focusing on that one thing she said, they looked at the other things that she said, which was generally a disaffection among what had been a different environment three years prior. Okay, let's hear from counsel for the interview now. Sure. Thank you very much. I'm going to ask for full enforcement. Thank you. Good morning. May it please the Court. Pamela Chandran for the union. I'd like to go back to the question of whether there was actually a delay of 12 weeks or whether it's more accurately characterized as proper preparation for negotiations after a period of several years in which the union has not been allowed to interact with its members because the employer has kept the union out of the hospital and because the turnover has been so high. Between the time of the election and the time of bargaining again, there had been 50% turnover, which is probably a conservative estimate because it doesn't take into account people who may have been employed subsequent to the election and left prior to negotiations beginning. The union was effectively starting from zero. Usually when you're beginning initial contract bargaining, you are coming off a period of momentum from the initial organizing efforts. Here the union had to reintegrate itself into meeting the nurses. It had to learn what the issues were with the nurses. It required those 12 weeks to properly and effectively bargain for the nurses. And as is noted, there was constant communication between the union's negotiator and Schottmiller, the negotiator for the employer, in which Schottmiller was amicably agreeing to the dates, to the progress, and was getting regular updates from the union. Was there evidence in the record of any of that, of what the union was doing during the time, preparing collective bargaining priorities, getting back in touch, getting information on new employees? Is there any evidence of any of that? Yes, Your Honor. The union informed the employer of certain steps it was taking for which it required the employer's cooperation. So if you look at Joint Exhibits 10 through 13, roughly, those are communications between the union, the union's negotiator, and Schottmiller, where they are coming up with bargaining dates, where they're deciding the logistics of bargaining, such as do we do it in a hospital, do we do it in a hotel, how are we splitting the costs for this? There are the typical preparations between two parties for negotiations. You have the union informing Schottmiller, here is the bargaining team that has been elected from the bargaining unit. How big was the bargaining unit, or was the bargaining unit at that relevant time? Approximately 100, I believe, nurses, and then the bargaining team comprised five nurses, all of whom needed to be released. That's typical with a hospital bargaining unit. And required to be prepared because nurses are not trained bargainers and they need a little boost. Thank you very much. Are there no more questions? Thank you. How much time does Mr. Kahn have? Give you two minutes. Okay. Thank you very much. I'd like to start, Your Honors, where Judge Blard, you were asking the general counsel at the end of her argument, well, there are four factors under master slack. Perhaps the first three are subjective. But the fourth talks to how were the employees actually affected by the ULPs here three years earlier? And you asked, well, what could we show? Well, you could show that in June 2012, there was an active, engaged union with bargaining unit members who were at the table, who were asked questions by the rest of the bargaining unit, and were encouraging and supporting the union. And then perhaps you could have testimony that after 12 months of bargaining, those same exact people who just 12 months earlier were actively supporting, no longer supported the union. They thought bargaining was taking too long. They thought the union wasn't doing a good job representing them. That, to me, shows a change in perspective from that bargaining unit. And that's exactly what we have here. The general counsel's own witness, who is a UNAC employee, not a bargaining member, a UNAC employee responsible for maintaining the relationship, testified that when she returned from maternity leave, she left maternity leave in mid-2012, returned in mid-2013, essentially missed the bargaining, that there was an almost 180-degree change in the bargaining unit. People were not interested. Bargaining unit members attributed slow-moving negotiations, high employee turnover, and employees not trusting the union to represent them. That was her testimony based on her communications with members of the bargaining unit. In 2012, two years after ULPs, everyone loves the union. In 2013, three years after ULPs, things have changed. How do we know everyone loves it in 2012? What's the testimony everyone's loving in 2012? She testifies. This is her same testimony, okay. I'm at 156 of the transcript, line 20. Yes, before I went on maternity leave, they were very active. They were at negotiation sessions and passed out literature to pass out for them. And then she goes on to talk about why those people are not active over the next 10 pages. I'm sorry, where are you reading from? I'm sorry, Your Honor. I'm at the transcript, page 156. I don't think I have. So it's JA-377? It might be 387, Your Honor. 156, did you say? Yeah, I'm looking at page, yeah. Yeah, I think it's ours. It's paginated 377. Okay, yeah, I see the red one. Yes, that's where it is, Your Honor. And this testimony of the next 10 pages where, again, she's talking about meeting other employees who were actively interested, supported the union, but they backed away. They no longer trust the union. They did not talk to her because they didn't want the union anymore, which is what we find out is the case from Mr. Lopez's decertification petition. That change has nothing to do with the UOPs. They support the union in 2012. They don't in 2013. That is exactly the evidence Your Honor is asking for, and it was presented here. Unlike the cases that the Board relies on where there was no evidence to support the fourth factor, and the Board says, look, where there's no evidence in the fourth factor, we just look at the other three. Here, there was clear evidence on the fourth factor. I'm sorry, I'm still having trouble. I'm sorry. Who was very active? I thought it was the union. I thought she was describing the union as being very active in 2012, which they should have been. No, she's talking about, if you continue to read up at line three, why were you asking about those three? They were the kind of secondary leaders next to Marlene, who was the head of the bargaining unit leadership. So when she's saying they, had they attended union meetings and negotiation sessions, et cetera, they were very active. She goes on to say, no, they're not active anymore. That's those three people? Those three, and then she talks about somebody else on, she talks about phone banking on the next page of the transcript at the end. I was supposed to call all the nurses and give them status. People weren't returning my phone calls anymore. The conversations, this is the next page, the conversations I'm having are very different. People are giving me, either ignoring me entirely, giving me one-word responses. This is very different than when I left in mid-2012, than how people treated me in mid-2013. And the difference there is a year of bargaining, not ULPs. The ULPs are two, three years prior. So you've got people who have disaffection from the union representing them. No other reason. It's the only thing we have on the record. And the other point that's important to make here, which I think you touched on earlier, is you've got 12 months of good faith bargaining. The ALJ says unequivocally it's good faith bargaining. This is not slow-walking bargaining. 25 bargaining sessions, that's two a month, straight through for 12 months to the point there were only three outstanding issues. That should have been determined to remedy any ULPs. If you look at Lee Lumber, when the board says, Lee Lumber 2, the board says even the worst of ULPs for un-remedied ULPs in this context, which is a tire-related withdrawal, which you can't remedy otherwise, bargaining remedies that. Here we've got 12 months of unequivocal good faith bargaining. The only thing these employees knew, you know, that the union just stated that it was a more than 50% turnover, the only thing most of these employees knew was a union that was bargaining. They didn't know about ULPs or care about ULPs from 2010. They cared about ineffective bargaining. Thank you, Your Honors. Thank you. We have your argument. Mr. Totten, we'll give you a minute. Thank you. On the master slack factor four, this is precisely why Mr. Lopez should have been allowed to intervene in answer to Judge Pillard's question. What kind of testimony would an employee have given? If you look at Mr. Lopez's declaration in support of his motion to intervene, which is JA62, he says, quote, I have never supported you, NAC, because I believe the nurses at Chino Valley are treated fairly and well and therefore need no outside agent to speak for us. So his testimony and some of his coworkers would have been, we've been opposed to this union from the day they walked onto the property. Yeah. I'm not sure that you need to intervene, though, to give that kind of testimony. You can be called by the employer. Well, the employer didn't call him. That's the point. It's Mr. Lopez's Section 7 rights, and this is precisely why. So every employee who's not called gets to come intervene? Well, Mr. Lopez is the petitioner. He stood up. I'm not necessarily saying every employee needs to come in, but the fact is Mr. Lopez did come in with his attorney and went to the hearing. There weren't 92 other employees there willing to give this testimony. There was Mr. Lopez, the proponent of the petition. He was there. And that's the standard by which the court has to look at the intervention issue. Thank you very much, Your Honors. The case is submitted.
judges: Griffith, Millett, Pillard